

# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

GERALD C. MANN
ATTORNEY GENERAL

Honorable Fred T. Porter
County Attorney
Kaufman County
Kaufman, Texas

Dear Sir:                    Opinion No. O-2063
                             RE:  Whether or not "Box Office Insur-
                                  ance" constitutes a lottery.

          We have carefully considered the question presented
in your letter of March 7, 1940, wherein you request the
opinion of this Department as to whether or not the "Box Of-
fice Insurance Plan" of a local theatre constitutes a lottery
in violation of Article 654 of the Penal Code.  Your letter
reads in part as follows:

          "I would like to have an opinion from your
     department on whether the following plan of
     stimulating attendance at theatres is a lottery
      under the authorities in this state.  The plan
     is as follows:

          "It is called 'Box Office Insurance' and
     a printed policy is issued to each and every
     person contacted by the management of the show
     whether a patron or not.  This policy is worth
     the face value of $25.00 under certain condi-
     tions.  Once a week, on a certain night select-
     ed, the managment calls for numbers to be given
     by persons in the audience.  Four numbers are
     asked for, each being below 10, and these four
     numbers when arranged together form the number
     of the policy.  Before the issuance of any pol-
     icy the person receiving such signs an applica-
     tion card which is numbered and put in a file.
     If the person whose application card has the
      number called out by the audience is present
     in the theatre, he or she receives the cash
     value of the policy; but if the person is not
     in the theatre at the time of the calling out
     of the number and name, then the name of the
     one whose application card was so numbered shall
     be prominently posted in the lobby of the theatre
     for a period of one month, and any time during

the month the holder of that policy can call and
the management will pay the amount of the policy
to such holder.  If at the end of the one month
period, no one has called and presented such pol-
icy, then the amount of such policy is donated by
the theatre management to the Parent-Teachers As-
sociation of the town or if there is no Parents
Teachers Association then to some other like
organization.  There is attached hereto a copy
of the Policy, application card and envelope for
further information in regard to the plan."

Section 47 of Article III, of the Constitution of Texas,
reads:

"The Legislature shall pass laws prohibit-
ing the establishment of lotteries and gift en-
terprises in this state, as well as the sale of
tickets in lotteries, gift enterprises or other
evasions involving the lottery principal, estab-
lished or existing, in other states."

Article 654 of the Penal Code, reads as follows:

"If any person shall establish a lottery or
dispose of any estate, real or personal, by lot-
tery, he shall be fined not less than One Hundred
($100) Dollars nor more than One Thousand ($1,000)
Dollars; or if any person shall sell, offer for
sale or keep for sale any tickets or part tickets
in any lottery, he shall be fined not less than
Ten ($10) Dollars nor more than Fifty ($50) Dollars."

As stated to you in opinion No. 0-1819, dated January
27, 1940, the elements essential to constitute a lottery are
(1) a prize; (2) chance; (3) a consideration.  City of Wink vs.
Griffith Amusement Company (Texas Supreme Court), 100 S. W.
(2d) 695; Griffith Amusement Company vs. Morgan, 98 S. W. (2d)
844.  It is clear that the first two elements are present --
a prize of $25.00 is offered once a week; likewise, the chance
element occurs when the prize is distributed to the fortunate
"insured", if he is lucky enough to have his "policy" number
called.  Our problem concerns whether or not the necessary
element of consideration is present.

In this connection you point out that the money of-
fered may be received by two classes of prize-winners: first,
those within the theatre who have an opportunity to witness
and participate in the proceedings; and secondly, all other
people who are not in attendance at the theatre who have made

application for a "Box Office Insurance" policy.  In the event
one of the latter class of person's policy number is called,
his name will be posted in a prominent place in the lobby for
a period of one month, during which time he may call, indenti-
fy himself and receive the prize.

Insofar as the first class is concerned, that is, pa-
trons actually present in the theatre, there can be no doubt
that the scheme constitutes a lottery.  We quote from the
language of Chief Justice Cureton, City of Wink vs. Griffith
Amusement Company, supra:

> ".. . In the instant case, there were two
> different classes of possible prize winners,
> namely, the holders of free registration num-
> bers, who chose to remain outside of the theater,
> where neither the show nor the paraphenalia of
> and actual operation of the drawing could be
> seen, and those who, at least on 'Bank Night',
> paid the consideration required at the door, en-
> tered the theater, and saw the show, including
> the paraphernalia to be used in the drawing, and
> the actual drawing itself while comfortably seat-
> ed close at hand so that they might hear without
> fail the announcement of the winner and be pres-
> ent to claim the prize, each privilege a concomi-
> tant part of the entire scheme.  It is idle to
> say, as to whose who entered the theater and en-
> joyed the privileges named, that the admission
> charge was not both for the show and the pleasure
> and advantages stated above and the prize emolu-
> ment of the drawing.  This admission charge is in-
> separable from the privileges enumerated, which
> were materially different from the privileges of
> those who remained outside of the theater hold-
> ing the so-called 'free' registration numbers.
> It is idle to say that the payment made for see-
> ing the picture is not, in part at least, a charge
> for the drawing and the chance given.  The things
> to be seen and done in the theatre and the pri-
> vileges above enumerated which accompanied them,
> are all a part of one and the same show, meaning
> the entire proceedings inside the theater.  The
> fact that part of the things to be enjoyed  by
>  those who paid at the door were classed as 'free'
> by the defendant in error does not change the
> legal effect of the transaction, or what was ac-
> tually done by the defendant in error, namely,
> for the price of admission to grant the patron
> not only the opportunity to see and hear the pic-

ture, but to see and hear and enjoy the habili-
ments of the 'Bank Night', drawing, etc., detail-
ed above. We are unable to see in what manner
the giving of free registration numbers to those
outside of the theater would change the legal
effect of what was done inside the theater, for
which a charge was made; . . ." (Underscoring ours)

But what of those persons who may participate "free"
by merely making application for a policy and whose name (if
they are fortunate) will be posed in a prominent position in
the lobby? Does this device constitute an attempted evasion
of the lottery laws, or is the scheme outside their purview?
It has been said that had those who conducted the famous
Louisiana Lottery in the early days made good their promise
to give a free ticket to the president of each bank in the
state, still the scheme would not have escaped the condemna-
tion of the laws against lotteries.

The countless schemes of man to capitalize upon the
natural cupidity of his fellowman are legion; yet our Texas
courts have in all cases pierced the veil of subterfuge and
refused to countenance artifice. This is the position we be-
lieve our courts will take should a case like the present
come before them. We believe that a consideration does move
to the donor of the prize in the present instant sufficient
to condemn the plan even though participation is allowed by
non-patrons who have a month to claim their prize. As in the
first paragraph of your letter, the purpose of the plan is to
stimulate attendance, and, we suppose in addition serves as
an advertising scheme. Is this not at least an indirect con-
sideration moving to the owner of the theatre? We believe so.

As stated by Judge Graves in Cole v. State, 112 S. W.
(2d) 725, on motion for rehearing:

". . . A consideration may consist of a
benefit moving to the donor of the prize regard-
less from whom the benefit may come. See Corpus
Juris, vol. 13, p. 311. Appellant testified
that he thought since establishing a bank night
that it is possible on Tuesday night it (the
attendance) had increased some, and that the
advertisement for his theater, he thought, was
benefited by bank night, and, in the light of
our knowledge of human nature, we feel sure that,
unless such benefits had accrued, he would not
have continued such bank nights." (Underscoring
ours)

Likewise, as stated by Chief Justice Gallagher in Robb and Rowley United, Inc., et al v. State (C. C. A. 1939), 127 S. W. (2d) 221;

"Appellants apparently concede that 'Buck' nights as operated by them involved the distribution of cash awards by chance, but they contend that no consideration was received by them for such distribution. Substantially the same contention was made in the case of State v. Robb & Rowley United, Inc., Tex. Civ. App., 118 S. W. (2d) 917, and the court, in its opinion in that case, held that while no direct charge was made for registration, nevertheless the increased patronage expected by reason of the operation of such scheme, though only an indirect benefit, was a sufficient consideration to warrant its being classified as a lottery. See also: Cole v. State, 133 Tex. Cr. R. 548, 112 S. W. 2d 725, pars. 2 and 3; City of Wink v. Griffith, 100 S. W. (2d) 695, 699, par. 12, and authorities there cited; State v. McEwan, Mo. Sup., 120 S. W. (2d) 1098."

In Featherstone v. Independent Service Station Association, (C.C.A. 1928) 10 S. W. (2d) 124, defendants distributed tickets to patrons of their service station good for a chance on an automobile to be given away. Defendants likewise gave away some ticket free to those who had not purchased merchandise, and the court said:

"This testimony fails to show any material change in the scheme as originally operated, but reveals a change simply in the plan of its operation. While dealers, under the new plan, distributed tickets to noncustomers as well as to customers, it seems that the scheme was to distribute tickets, in the main to customers, as the evidence discloses that only a few, negligible in number, were given to persons other than customers. That the giving of tickets, and the drawings and distribution of prizes, were inducements to patronage and unquestionably lured customers, is shown from the very satisfactory business results that followed. Patronage thus induced was the consideration that passed from the ticket holder for the chance received, ....."

In Smith v. State, (Ct. Cr. App. 1939) 127 S. W. (2d) 297, defendant received a license fee from retail merchants for the privilege of joining a "Noah's Ark" organization.

The merchants in turn distributed cards and stamps to the public, upon the completion of which cards a person was entitled to participate in a chance to receive a substantial prize. The court held that payment of these license fees to defendants by the merchants operated as an indirect consideration for all persons who came to such merchants' place of business and requested a stamp or card for the purpose of entering into this contest. The court held this scheme to constitute a lottery and said:

> "We think it clearly appears herein that appellant received a fee from the 145 merchants and dealers who paid him a license fee and joined his 'Noah's Ark' organization, and that the payment of such fee operated as a consideration for the entering into the drawing contest of all persons who came to such dealers' place of business and requested a card or a stamp for the purpose of entering this contest. That this license fee was the payment of a consideration moving indirectly from the contestant and directly to the supervisor or owner of this scheme. Moving indirectly, it may be for the benefit of the contestant through his merchant or dealer who also received a benefit therefore presumably at least, in the advertising that he was obtaining as well as playing upon the natural cupidity of mankind to obtain something for nothing, and this moving it completes the trinity of a prize arrived at by chance, and based upon a consideration, not only given by the contestant but received by the donor." (Underscoring ours)

In view of the authorities cited and for the reasons stated, you are respectfully advised that it is the opinion of this Department that the "Box Office Insurance" plan under the facts stated constitutes a lottery in violation of Article 654 of the Penal Code of this State.

Very truly yours

JDS:LM:wc

APPROVED MAR 18, 1940
s/Gerald C. Mann
ATTORNEY GENERAL OF TEXAS

Approved Opinion Committee
By s/BWB Chairman

ATTORNEY GENERAL OF TEXAS

By s/Walter R. Köch
          Assistant

By s/James D. Smullen
          James D. Smullen